IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 7, 2006

**STATE OF TENNESSEE v. ERIC WILLIAMS**

**Appeal as of Right from the Criminal Court for Shelby County**
**No. 04-00534   W. Otis Higgs, Jr., Judge**

**No. W2006-00349-CCA-R3-CD  - Filed January 8, 2007**

The Defendant, Eric Williams, was convicted by a Shelby County jury of aggravated robbery.  On appeal, he alleges there was insufficient evidence for any rational jury to convict him of that crime. Finding no reversible error exists, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH, J. AND JAMES CURWOOD WITT, JR., JJ., joined.

Robert Felkner (at trial), and Garland Ergüden (on appeal), Memphis, Tennessee, for the Appellant, Eric Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Stephen Crossnoe and Rachel Newton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Facts**

This appeal arises from a conviction for aggravated robbery.  The Defendant, Eric Williams, contends there was insufficient evidence for a conviction.  The following evidence was presented at trial: the victim, Narvin Gray, testified that he was carjacked at gunpoint shortly after midnight on August 15, 2003.  He had just arrived at his home, which he was renovating, after getting something to eat at Wendy's.  When he pulled into the driveway of his house, he got out and reached over to get the food out of the passenger seat.  He then heard a click, turned around and saw a man standing there pointing a gun at him.  He further described the incident and stated that the Defendant told him to hand over the keys, which he did.  The victim then asked the Defendant if he could get

his backpack out of the vehicle, because the victim's medicine was in it. The Defendant responded, "Would you prefer I just shoot you in the head?" The victim said, "Keep it." The victim identified the Defendant as the man who robbed him and a gun, which was later admitted into evidence, as the gun used to assault him.

The victim testified that the Defendant backed the vehicle out of the driveway, almost hit a light pole, and drove down Jackson Avenue. The victim testified that, at one point, the Defendant got within two feet of him, and because of a street light that was close by, the victim could clearly see the Defendant. The victim focused on the distinctive features of the Defendant, including "slashes" in his eyebrows and a tattoo on his neck.

The victim testified that he did not own the vehicle; it was his sister's. The victim, however, could drive the vehicle whenever he wanted as he had a set of keys. After the Defendant drove off in the vehicle, the victim ran to a gas station which was about one-quarter of a mile from his home. The store clerk called the police.

Later, on August 25, the victim was sitting at his desk at work, when he received a call from his sister. His sister told him that her fiancé had found the vehicle, so they called the police. He went to pick his sister up, and they drove out to the apartment building where the vehicle had been spotted. The police instructed them not to go anywhere near the vehicle, so they parked far enough away to see the vehicle, but not to be spotted themselves. The police sent an unmarked police car to the scene, and within an hour, they all saw a woman walk out to the vehicle, open the door and get in. The unmarked police car pulled up behind the vehicle, and the police detained the woman. The next thing the victim saw was the Defendant in the back of a squad car. The victim testified he had never met the Defendant before, and the Defendant had never been in his house.

On cross-examination, the victim testified he was out that night getting his keys back from a friend who had borrowed his car for a doctor's appointment. The victim was preparing to stay at his house instead of his mother's because it was so late. This was despite the fact that there was no air conditioning and it was mid-August. The street light was not blocked by any trees, but despite it being a well lit area, the victim did not see the Defendant when he pulled into the driveway. The victim admitted that the gun which he was shown and identified was clearly not silver, but he claimed it appeared silver because of the light reflecting off of it. The victim stated he had planned on staying at the home, despite there being no air conditioning or a working bathroom. The victim did not normally keep the lights on when he was away, so it was unlikely that someone would know the layout of the home if he had merely passed by it at night. The home had hardwood floors, a stainless steel kitchen sink, but no cushions on the floor to sit on.

On re-direct examination, the victim testified that his backpack was a medium sized black backpack. His home had four windows on the front of the house with nothing covering the windows.

Officer Patrick Jones testified that he received a call from dispatch that a black male had been robbed of his vehicle at gunpoint. He met with the cooperative victim that night, and he entered the

information into a database, which other officers access, that tells the officers that the vehicle has been stolen and to approach with caution. Officer Jones never went to the scene of the crime. On cross-examination, Officer Jones testified that he did not recall whether the victim described the Defendant or the weapon that was used. On re-direct, Officer Jones testified that uniformed officers do not investigate robberies, the robbery bureau does that.

Eric Hollowell testified that he had been dating the victim's sister for about six months at the time of the robbery. At that time he was very familiar with the vehicle as he had ridden in it, driven it, and worked on it numerous times. On August 25, 2003, at about 7:30 in the morning, he was driving from work to his mother's house, when he spotted the vehicle at Greenbriar Apartments. Hollowell called his sister, who called the police while he remained at the scene. On cross-examination, Hollowell testified that spotting the vehicle was just a coincidence, and he was not sent to these apartments. The route he took was a short-cut to his mother's house.

Karen Gray, the victim's sister, testified that she had owned the vehicle for a few years, and it was a light green-gray colored Ford Expedition. The victim had permission to drive it. On August 25, 2003, she was called by her boyfriend, who stated that he believed that he had found the vehicle. Hollowell specifically noticed a few dents and a scratch across the back window. Gray called the victim at work, and they conference called 9-1-1. She and the victim went to the location where they found Hollowell waiting for them. They waited until they saw a woman get into the vehicle, when a small black pickup pulled up behind it. Police officers exited the pickup and detained the woman. Gray was called over to identify the vehicle, which she stated was hers. There was nothing wrong with the vehicle except for it being "stinking and dirty." After two weeks she got her vehicle back.

On cross-examination, Gray testified that she did not remember anything specific about what she and her brother were doing the night of August 15, 2003. However, she did state that the victim took her vehicle instead of his because her vehicle was parked behind his in the driveway. The victim stayed at the house he had recently bought on occasion, and he bathed and showered there. Gray owed roughly ten thousand on the vehicle at the time of trial. After further questioning, Gray did remember that the victim took her vehicle because he could not find his keys. She remembered that the victim's friend actually had the keys. Gray could not recall specifically what time the victim left their mother's house.

Officer Lucas McNair testified that he was called to the Greenbriar Apartments on the morning of August 25, 2003, after a vehicle was spotted that was reportedly taken in a carjacking. He went to that location in a brown pickup and parked about one hundred yards away from the vehicle. After about ten or fifteen minutes, he saw a woman approach the vehicle, pull out keys, and get in the driver's seat. He pulled up behind the vehicle so as to block it in, and he detained the woman. The woman stated that the vehicle belonged to someone in the apartment directly in front of the vehicle, which officers were directed to.

Angelic Thornton testified that she had been staying with her sister for about three months at 3171 Madewell, Apt. E. Thornton had known the Defendant for about three years, and he would

come and go. This time, he had come in the Expedition and claimed it belonged to a friend of his. Thornton stated that when the Defendant arrived at the home, he had a backpack with him which was possibly blue or gray. Thornton took her kids to school the morning of August 25, 2003, in the Expedition. Afterwards, she went out to the vehicle to go to south Memphis when a small pickup pulled up behind her, and a man jumped out with a gun. She was thrown to the ground and handcuffed. She stated that the person who owned the vehicle was inside the apartment. The officers entered the apartment and came out with the Defendant. Thornton was taken to the downtown police station where she gave a statement and was allowed to leave.

Officer Charles Teeters testified that he was in an unmarked police car monitoring the scene on August 25, 2003, when Officer McNair told him to approach because he had seen someone getting into the vehicle. When he arrived, Officer McNair stated that the person responsible for the carjacking was inside a close-by apartment. Officer Teeters knocked on the door and was met by Eric Williams, the Defendant. When the door was opened, he noticed what appeared to be a fully automatic tech nine handgun sitting on the couch behind the Defendant. He entered the apartment, did a protective sweep and secured the handgun. He attempted to unload the gun, which he was unable to do. He then called a member of the SWAT team to come unload the gun, and that person was successful. The gun was then passed to Officer Monistere. The Defendant was not given any Miranda warnings. On cross-examination, Officer Teeters testified he had no personal knowledge of the alleged carjacking; he was merely involved to the extent he previously testified to.

Officer Monistere testified he was called to the Greenbriar Apartments in order to possibly provide transportation. When he arrived, officers were entering the apartment. The Defendant was handcuffed and placed in the back of his squad car. Officer Monistere was given the weapon that was found at the scene, and he tagged it and placed it into an evidence box.

Sargent Joe Stark testified that he investigated a robbery and interviewed the Defendant concerning it. After initially asking for an attorney, the Defendant stated he wanted to talk with Sargent Stark. The Defendant described the encounter with the victim as follows: the Defendant was walking along Park Avenue when the victim pulled up and stopped. The victim asked the Defendant if he "wanted to party," after which they went to buy beer. The two drove to the victim's home and went inside. The victim asked the Defendant to have sex, which the Defendant refused. The victim then got drunk and passed out. The Defendant then took the keys to the victim's vehicle. The Defendant then described the victim's house as having shiny wood floors, stools with wheels on them, and a working toilet. It was a one story house but did not have a stove. The Defendant also called the victim by the name "Lynn."

Sargent Stark then went to interview the victim, who stated his name was "Lynn." He toured the house and stated that the bathroom did not have any walls or bathroom fixtures. There was no stove, as the Defendant claimed, but the hardwood floors were not shiny and the bar stools did not have wheels on them. Sargent Stark also stated that there were big, open windows on the front of the house through which one could see different parts of the house. This information was provided to Sargent Wong, who decided to bring charges against the Defendant.

-4-

On cross-examination, Sargent Stark stated that if one attempted to look through the windows at night, without any lights on, the house would be difficult to see into. There were certain things which the Defendant was correct about, including that there were hardwood floors, a stainless steel sink, and paint buckets in the dining room. Sargent Stark did not take any pictures or talk to any neighbors. The house appeared to be vacant.

Lieutenant Kam Wong testified that he was in the robbery bureau in 2003, and he was the case coordinator for the present case. He had other officers obtain statements, and he interviewed Thornton himself. Lieutenant Wong determined the Defendant should be charged because the victim identified the Defendant, the vehicle was recovered, and there was information indicating the Defendant was not credible.

On cross-examination, Lieutenant Wong testified he never went to the scene of the carjacking, and he never asked anyone to photograph the scene or interview the neighbors. No one was sent to the home to take photos or fingerprints of the inside of the home. He never wondered how the Defendant would know so much about the inside of the home.

Upon this evidence, the jury convicted the Defendant of aggravated robbery.

## II. Analysis

The Defendant asserts that there was insufficient evidence for the jury to convict him of aggravated robbery. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see

the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of aggravated robbery. Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). A robbery becomes aggravated when the defendant "display[s] . . . any article used . . . to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a) (2003).

The victim testified the Defendant approached the victim from behind and took the vehicle he was driving at gunpoint. The victim stated he was afraid. Days later, the vehicle and a gun substantially similar to the one described were discovered, and the Defendant was arrested. This is ample evidence upon which to convict the Defendant of aggravated robbery.

The Defendant argues that one would not be able to describe the inside of the victim's home if the victim's story were to be believed. Instead, the Defendant claims his story is more plausible. However, this Court is not in a position to make credibility determinations. The Defendant's allegation of error is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE